UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Ashland)

| | | |
|---|---|---|
| BOYD NURSING AND REHABILITATION, LLC, et al., | ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 0: 22-011-DCR |
| V. | ) ) | |
| LEONARD J. WELLS, as Administrator of the Estate of Opal L. Wells, | ) ) ) | **MEMORANDUM OPINION AND ORDER** |
| Defendant. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

Plaintiffs Boyd Nursing and Rehabilitation, LLC and Boyd Nursing and Rehabilitation Holdings, LLC ("the plaintiffs" or "Boyd Nursing") seek to compel Defendant Leonard J. Wells ("Leonard" or "the defendant"), Administrator of the Estate of Opal L. Wells ("Opal"), to submit to arbitration pursuant to the Federal Arbitration Act ("FAA") and enjoin his related case in the Boyd Circuit Court ("the State Court Action").  Leonard has filed a motion to dismiss the plaintiffs' petition, asserting a multitude of arguments why this matter should not proceed.

Most of the defendant's arguments are frequently litigated and just as frequently rejected in this district.  Only one argument concerning his authority to sign the arbitration agreement at issue ("the Arbitration Agreement") is novel and, potentially, viable.  However, dismissal on this basis is not an appropriate remedy.  Thus, while this case presents one of the rare instances in which a defendant opposing arbitration survives the initial stage of an FAA

proceeding, the Court will not dismiss this action.  Instead, this matter will proceed to trial on limited issues as set forth in further detail below.

## I. Background

Opal executed an "Unlimited Power of Attorney" ("the Power of Attorney") on August 10, 2010, providing her son Leonard with powers to take certain actions on her behalf as her attorney-in-fact and agent.  [Record No. 1-3]  On November 26, 2013, Opal was admitted to the Boyd Nursing and Rehabilitation Center, a nursing home in Ashland, Kentucky where she would live for the remaining years of her life.  [Record No. 1-2, ¶ 3]  "When . . . new owners took over the Boyd Nursing and Rehabilitation" in 2019, "they undertook steps to obtain signatures on paperwork regarding Opal."  [Record No. 9-5, ¶ 6]  This new paperwork included the Arbitration Agreement.  [Record No. 1-1]

The Arbitration Agreement is ostensibly marked as paragraph 16 of a larger document and occupies pages 9 through 11 of that document.  [*Id.*]  The defendant acknowledges this point by claiming that the Arbitration Agreement is "embedded in a lengthy admission agreement rather than being a stand-alone, conspicuous document."  [Record No. 6-1, p. 23]  The Arbitration Agreement nonetheless has its own signature block, and Leonard signed it as his mother's "Responsible Party."  [Record No. 1-1, p. 3]

Opal passed away on September 9, 2020, and Leonard filed the State Court Action on July 23, 2021, acting on behalf of her estate and wrongful death beneficiaries.  [Record No. 6-1, pp. 1-2]  The operative January 20, 2022 second amended complaint in that case proceeds against, *inter alia*, the plaintiffs in this action and Cindy Salyers in her capacity as administrator of Boyd Nursing and Rehabilitation Center.  [Record No. 1-2]  Leonard alleges claims in the State Court Action for negligence, medical negligence, corporate negligence, and

wrongful death against the plaintiffs, as well as negligence and wrongful death claims against Salyers.  [*Id.*]

The plaintiffs filed this action on February 11, 2022, petitioning the Court to compel arbitration pursuant to the Arbitration Agreement and the FAA, 9 U.S.C. § 4.  [Record No. 1] The plaintiffs claim that the Power of Attorney provided Leonard with the authority to sign the Arbitration Agreement on Opal's behalf.  [Record No. 1, ⁋ 16]  The Complaint also requests that the Court enjoin the defendant from further pursuing his claims in the State Court Action consistent with the Anti-Injunction Act, 28 U.S.C. § 2283.  [*Id.*]  The defendant filed the pending motion to dismiss on March 7, 2022, and it has now been fully briefed.  [Record Nos. 6, 7, and 9]

This action was initially assigned to Senior United States District Judge Henry R. Wilhoit, Jr., but later transferred to the undersigned on August 8, 2022.  [Record No. 10] Having reviewed the parties' filings, the Court will address the relevant issues in the context of the motion to dismiss, except as where otherwise stated below.

## II.  Threshold Issues

Leonard claims that several threshold issues require dismissal of this action, including a lack of subject matter jurisdiction, a failure to join an indispensable party, and the *Colorado River* abstention doctrine.  Because these issues pertain to jurisdiction (or the exercise of jurisdiction), the Court will address them in turn before proceeding to the arguments concerning the validity and enforceability of the Arbitration Agreement.

### A.  Subject Matter Jurisdiction

First, the defendant asserts that this action should be dismissed for lack of subject matter jurisdiction under Rule 12(b)(1).  A motion to dismiss for lack of subject matter jurisdiction

may proceed as a facial or factual challenge under Rule 12(b)(1). *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.* "A factual attack challenges the factual existence of subject matter jurisdiction." *Id.* The "court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings, and has the power to weigh the evidence and determine the effect of that evidence on the court's authority to hear the case." *Id.* at 759-60. As the parties asserting federal jurisdiction, the plaintiffs "bear[] the burden of establishing that subject matter jurisdiction exists." *Id.* at 760 (citing *DLX, Inc. v. Commonwealth of Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004)).

The FAA is "something of an anomaly" in jurisdictional terms because it "bestows no federal jurisdiction but rather requires for access to a federal forum an independent jurisdictional basis over the parties' dispute." *Vaden v. Discover Bank*, 556 U.S. 49, 59 (2009) (cleaned up). Specifically, the statute provides:

> A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction under title 28, in a civil action or in admiralty of the subject matter of a suit arising out of the controversy between the parties . . . .

9 U.S.C. § 4. Here, the plaintiffs assert that the Title 28 basis for subject matter jurisdiction is diversity of citizenship under 28 U.S.C. § 1332. Under 28 U.S.C. § 1332(a)(1), "district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between . . . citizens of different States . . . ."

- 4 -

The Complaint alleges that Plaintiff Boyd Nursing and Rehabilitation, LLC is a citizen of New York because its sole member is Plaintiff Boyd Nursing and Rehabilitation Holdings, LLC, which itself has one member who is a New York citizen. [Record No. 1, ⁋⁋ 3-4] Thus, the plaintiffs are both citizens of New York. *See Akno 1010 Market Street St. Louis Missouri LLC v. Pourtaghi*, --- F.4th ----, 2022 WL 3148057, at *2 (6th Cir. 2022) ("LLCs have the citizenships of their members and sub-members."). The Complaint also alleges that Leonard is a citizen of Kentucky, satisfying the requirement that the parties be completely diverse. [Record No. 1, ⁋⁋ 5-6]

The plaintiffs have provided the operative State Court Action pleading, which specifically alleges compensatory damages for "significant medical expenses, . . . embarrassment, physical impairment, and loss of life." [Record No. 1-2, ⁋ 78] It also asserts a claim for punitive damages. [*Id.* at ⁋ 79.] The Complaint in this matter alleges that, because the defendant seeks these compensatory and punitive damages in the State Court Action, the requirement that the amount in controversy be in excess of $75,000.00, exclusive of interests and costs, is satisfied. [*See* Record No. 1, ⁋ 7.] Leonard does not dispute these points. Instead, he relies on the United States Supreme Court's "look through" approach in *Vaden*.

This Court has previously summarized *Vaden* as follows:

[A] credit card company, Discover, sued a cardholder for past-due charges in state court. The cardholder asserted state law counterclaims that Discover considered preempted by federal banking law. Discover also filed a § 4 petition in federal district court to compel the arbitration of the counterclaims. Tracking the language of 18 U.S.C. § 1331, the [Supreme] Court held that a federal court should "look through" a § 4 petition to determine whether it is predicated on a controversy that "arises under" federal law. The *Vaden* Court found that, when looking through to the whole controversy between the parties, the action did not qualify for federal-court adjudication because there was no federal question. Thus, the Supreme Court held that the district court lacked subject matter jurisdiction.

*Brookdale Senior Living, Inc. v. Caudill*, No. 5: 14–098–DCR, 2014 WL 3420783, at *2 (E.D. Ky. July 10, 2014) (internal citations omitted).

Leonard argues that the Court should apply *Vaden* in the diversity jurisdiction context and find that the parties to the underlying controversy are not completely diverse, destroying jurisdiction. [Record No. 6-1, pp. 5-11] Specifically, Leonard contends that Salyers (a defendant in the State Court Action) is a citizen of Kentucky, and her presence destroys complete diversity because he, a Kentucky citizen, is the plaintiff in that case. [*Id.* at p. 6.]

However, as the plaintiffs note [Record No. 7, pp. 4, 6], this Court has consistently rejected arguments that *Vaden's* "look through" approach should apply to § 4 petitions premised on diversity jurisdiction. *See, e.g.*, *GGNSC Stanford, LLC v. Gilliam*, 205 F. Supp. 3d 884, 888 (E.D. Ky. 2016); *Preferred Care, Inc. v. Howell*, 187 F. Supp. 3d 796, 805 (E.D. Ky. 2016); *Caudill*, 2014 WL 3420783, at *3-4; *Brookdale Senior Living Inc. v. Stacy*, 27 F. Supp. 3d 776, 782 (E.D. Ky. 2014). As the United States Court of Appeals for the Eighth Circuit has stated, "the Supreme Court carefully defined the issues and limited its holding to § 4 petitions based upon federal question jurisdiction." *Northpoint Health Servs. of Arkansas, LLC v. Rutherford*, 605 F.3d 483, 488 (8th Cir. 2010).

Along similar lines, *Vaden* addressed the meaning of the term "controversy" as it is used in the § 4 phrase "controversy between the parties," not the term "parties," which is what the defendant actually disputes by arguing that the Court should consider Salyers' citizenship. *ADT, L.L.C. v. Richmond*, 18 F.4th 149, 152 (5th Cir. 2021).[1] And courts interpret the term

---

[1] Relatedly, the term "controversy" in "controversy between the parties" cannot encompass the term "parties," as Leonard appears to insinuate. [Record No. 6-1, p. 6] If it did, Congress "would not have written 'between the parties' at all." *ADT*, 18 F.4th at 156.

"parties" under § 4 to include only the parties in a federal action to compel arbitration (*i.e.*, this case), not parties in an underlying state court action. *See id.* at 152-56; *Hermès of Paris, Inc. v. Swain*, 867 F.3d 321, 324-26 (2d Cir. 2017); *Rutherford*, 605 F.3d at 489-91; *see also PaineWebber, Inc. v. Cohen*, 276 F.3d 197, 205-06 (6th Cir. 2001) (citing *Doctor's Assocs., Inc. v. Distajo*, 66 F.3d 438, 445 (2d Cir. 1995)) (endorsing the United States Court of Appeals for the Second Circuit's view on this issue in the context of a pre-*Vaden* Rule 19(b) indispensable party analysis).

From a textual standpoint, this is the correct conclusion because § 4 includes other references to a "party" or "parties," which clearly pertain to litigants of the § 4 suit, *i.e.*, the parties that "fail, neglect, or refuse to arbitrate under a written agreement for arbitration" (§ 4 suit defendants) and "those whom the first aggrieve by not submitting to arbitration" (§ 4 suit plaintiffs). *ADT*, 18 F.4th at 152 (cleaned up). And from a broader perspective:

> Reading "parties" to mean only the parties to the § 4 petition also advances the core policy behind the look-through test. *Vaden* stressed that looking only to a § 4 petition to define the parties' controversy would invite litigants to manipulate federal jurisdiction. The look-through test defeats artful pleading by ensuring that federal jurisdiction over a petition to compel arbitration corresponds with federal jurisdiction over the parties' actual dispute.

> Likewise, uncritically crediting how the first litigant defines the parties, as the [§ 4 defendants] suggest, would invite "artful dodges" of federal jurisdiction. After agreeing to arbitrate its claims against a diverse defendant, a party could breach that compact, sue in state court, and join a nondiverse nonparty to its suit to deprive federal courts of the power to hold it to its bargain.

> The [§ 4 defendants'] rule also would trap those seeking to enforce arbitration agreements between a rock and a hard place: If they move early to compel arbitration, beating a state-court filing, the dispute may be unripe. But if they wait until after the plaintiff has filed a state-court complaint, that plaintiff may defeat federal jurisdiction by suing a nondiverse nonparty. Allowing that tactic would "fatally undermine the FAA," and cheapen the power of [federal courts].

*Id.* at 154-55 (cleaned up).

Thus, the Court will once again decline to "look through" to the parties of the State Court Action for the purposes of assessing complete diversity.  This action will not be dismissed for lack of subject matter jurisdiction.

### B.  Failure to Join an Indispensable Party

Relatedly, the defendant argues that this case must be dismissed for failure to join Salyers, an allegedly indispensable party, pursuant to Rules 12(b)(7) and 19.  Under Rule 19(a), "[a] court must first determine 'whether a person is necessary to the action and should be joined if possible.'"  *PaineWebber*, 276 F.3d at 200 (quoting *Soberay Mach. & Equip. Co. v. MRF Ltd., Inc.*, 181 F.3d 759, 763-64 (6th Cir. 1999)).  A party is "necessary" for the purposes of the rule if:

> (A) in that person's absence, the court cannot accord complete relief among existing parties; or
> (B) that person claims an interest relating to the subject of the action and is so situated that disposing of the action in the person's absence may:
>> (i) as a practical matter impair or impede the person's ability to protect the interest; or
>> (ii) leave an existing party subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations because of the interest.

Fed. R. Civ. P. 19(a).  "If the party is deemed necessary for the reasons enumerated in Rule 19(a), the court must next consider whether the party is subject to personal jurisdiction and can be joined without eliminating the basis for subject matter jurisdiction."  *PaineWebber*, 276 F.3d at 200.

Finally, the Court must evaluate "whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent party being thus regarded as indispensable" under Rule 19(b).  *Id.* (cleaned up).  "Dismissal should occur only if an indispensable party is not subject to personal jurisdiction or cannot be joined without

eliminating the basis for subject matter jurisdiction." *Id.* (citing *Soberay Mach. & Equip. Co.*, 181 F.3d at 770).

The defendant asserts several Rule 19 arguments: (1) Salyers is a "necessary" party because "complete relief simply cannot be accorded" without her joinder and "actions against [her] would be left outstanding from the underlying controversy"; (2) Salyers is a beneficiary of the arbitration agreement; and (3) Salyers' alleged torts are "intertwined" with those of Boyd Nursing and the torts alleged in the State Court Action "constitute a holistic course of conduct amongst all [of its] defendants." [Record No. 6-1, pp. 14-15] Because Salyers' presence would destroy complete diversity, Leonard argues that the case must be dismissed. [*Id.* at p. 15.]

The first argument addresses the initial step of the Rule 19 inquiry, and it has proved persuasive for the purposes of the "necessary" party analysis in cases where parties assert that nursing home administrators are indispensable parties. *See*, *e.g.*, *BLC Lexington SNF, LLC v. Peterson*, No.: 5:19-cv-00465-GFVT, 2020 WL 3130292, at *5 (E.D. Ky. June 12, 2020); *Stacy*, 27 F. Supp. 3d at 783. However, Salyers' status as a "necessary" party does end the overarching inquiry. Nor does the fact that her presence would destroy complete diversity.

And the defendant's remaining arguments, which address Rule 19(b), fail because the United States Court of Appeals for the Sixth Circuit has rejected them. In *PaineWebber*, the court made clear that an arbitration agreement's potential application to an unnamed person who is a defendant in the underlying state court action does not render that person an indispensable party under Rule 19(b). 276 F.3d at 203. Thus, the potential application of the Arbitration Agreement to Salyers does not make her an indispensable party.

Moreover, the *PaineWebber* court observed that "a person's status as a joint tortfeasor does not make that person a necessary party" for the purposes of Rule 19(a), "much less an

indispensable party" for the purposes of Rule 19(b). *Id.* at 204 (citing *Temple v. Synthes Corp.*, 498 U.S. 5, 7-8 (1990) (per curiam); *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 946 (11th Cir. 1999)). The plaintiff's last point is merely an intricate joint tortfeasor argument.

It is not uncommon for § 4 defendants in similar cases to assert that nursing home administrators are indispensable parties. But this Court has consistently rejected this argument. *See, e.g., Gilliam*, 205 F. Supp. 3d at 889-90; *Howell*, 187 F. Supp. 3d at 805; *Stacy*, 27 F. Supp. 3d at 783-84. Indeed, the Court has repeatedly declined to follow the case Leonard claims to be "on all fours" with this action, *Cytec Indus., Inc. v. Powell*, 630 F. Supp. 2d 680 (N.D. W. Va. 2009), because it is contrary to circuit precedent established in *PaineWebber*. *See, e.g., BLC Lexington SNF, LLC v. Oatis*, No. 5:19-284-DCR, 2019 WL 6221006, at *11, n. 4 (E.D. Ky. Nov. 20, 2019); *GGNSC Frankfort, LLC v. Tracy*, No. CIV. 14–30–GFVT, 2015 WL 1481149, at *6-7 (E.D. Ky. March 31, 2015); *Caudill*, 2014 WL 3420783, at *6 n. 2; *Stacy*, 27 F. Supp. 3d at 783-84. Leonard has offered no reason to reach a contrary conclusion or otherwise diverge from this line of cases.

## C. Abstention

The defendant next argues that the Court should abstain from exercising jurisdiction under the doctrine set forth in *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800 (1976), and its progeny. [Record No. 6-1, pp. 16-19] When considering abstention under this doctrine, the Court first assesses whether the "concurrent state and federal actions are . . . parallel." *Romine v. Compuserve Corp.*, 160 F.3d 337, 339 (6th Cir. 1998) (citing *Crawley v. Hamilton County Comm'rs*, 744 F.2d 28 (6th Cir. 1984)). If the actions are parallel, the Court determines whether abstention is appropriate using eight factors:

> (1) whether the state court has assumed jurisdiction over any res or property; (2) whether the federal forum is less convenient to the parties; (3) avoidance of piecemeal litigation; (4) the order in which jurisdiction was obtained; (5) whether the source of governing law is state or federal; (6) the adequacy of the state court action to protect the federal plaintiff's rights; (7) the relative progress of the state and federal proceedings; and (8) the presence or absence of concurrent jurisdiction.

*PaineWebber*, 276 F.3d at 206.

The parties agree that this case and the State Court Action are parallel for the purposes of the present analysis.  [Records Nos. 6-1, p. 16 and 7, p. 7]  Thus, the Court will proceed to address the abstention factors.

There is no indication that Boyd Circuit Court has assumed jurisdiction over any res or property.  The first factor accordingly favors the exercise of federal jurisdiction.  Leonard claims, without elaborating, that the second factor favors abstention because the state court is a more convenient forum.  [Record No. 6, p. 3]  However, this factor "relates to geographical considerations."  *PaineWebber*, 276 F.3d at 207.  And Boyd Circuit Court is located in Catlettsburg, Kentucky, a mere five miles downriver from Ashland, Kentucky where this action is pending in federal court.  The federal forum has no apparent geographic inconvenience, and the second factor weighs in favor of exercising jurisdiction.

The defendant asserts that the third factor (i.e., the "avoidance of piecemeal litigation") merits abstention based on a possibility "of the [Arbitration] Agreement being found valid and enforceable in one forum and invalid in the other."  [Record No. 6-1, p. 17]  The Sixth Circuit has expressed some support for this view in cases where it is asserted that the problem of piecemeal litigation pertains to a determination on "the arbitration issue itself."  *Preferred Care of Delaware, Inc. v. VanArsdale*, 676 F. App'x 388, 395 (6th Cir. 2017).  By contrast, piecemeal litigation is "inherent in suits involving underlying contractual claims not all of

- 11 -

which are subject to arbitration."  *Id.* (citing *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1 (1983)).

Still, the facts of *VanArsdale* are meaningfully distinct from those of this case.  In *VanArsdale*, the risk of the concerning type of piecemeal litigation was manifest because the state court granted summary judgment on the arbitrability issue before the federal district court could rule on the § 4 petition.  *Id.* at 389.  In other words, the federal court would have had to decide an issue already resolved in state court had it not abstained from exercising jurisdiction.

Here, there is no indication that the state court has already decided the issue of arbitrability.  And the Sixth Circuit has observed that the FAA's strong policy in favor of arbitration generally disfavors abstention even when exercising jurisdiction will necessarily result in what are effectively bifurcated proceedings.  *See Answers in Genesis of Kentucky, Inc. v. Creation Ministries Int'l, Ltd.*, 556 F.3d 459, 467-68 (6th Cir. 2009); *PaineWebber*, 276 F.3d at 207.  Thus, this factor is likely neutral and may slightly favor the exercise of jurisdiction.

The fourth *Colorado River* factor favors abstention, but only slightly.  The United States Supreme Court has clarified that jurisdictional "priority should not be measured exclusively by which complaint was filed first, but rather in terms of how much progress has been made in the two actions."  *Moses H. Cone*, 460 U.S. at 21.  "Where 'there is no indication that any significant proceedings have taken place in the state court,' the importance of which court assumed jurisdiction first is diminished significantly."  *Stacy*, 27 F. Supp. 3d at 785 (quoting *Great Earth Cos., Inc. v. Simons*, 288 F.3d 878, 887 (6th Cir. 2002)).  The Boyd Circuit Court certainly obtained jurisdiction prior to this court, but Leonard acknowledges that the State Court Action is "still in the pleading stage."  [Record No. 6-1, p. 17] That

representation was made in a brief filed March 7, 2022, several months before this matter was transferred to the undersigned.  That said, the parties have not submitted any subsequent filings indicating significant progress in the State Court Action.  Thus, this factor only marginally supports abstention.

The fifth factor concerning the source of governing law weighs in favor of exercising jurisdiction.  Although the validity of the arbitration agreement involves questions of Kentucky law, the FAA also governs and "the presence of federal law issues must always be a major consideration weighing against surrender of federal jurisdiction in deference to state proceedings." *Gilliam*, 205 F. Supp. 3d at 891 (quoting *Howell*, 187 F. Supp. 3d at 806).  Under such circumstances, this factor counsels against abstention.  *Id.*; *accord Stacy*, 27 F. Supp. 3d at 786.

The sixth factor, "the adequacy of the state court action to protect the federal plaintiff's rights," is neutral.  On the one hand, "[t]he FAA extends Congress's legislative authority to the maximum extent permitted under the Commerce Clause, and is therefore binding on state courts that interpret contracts involving interstate commerce." *PaineWebber*, 276 F. 3d at 208.  And as this Court has consistently found in similar cases, the Arbitration Agreement involves interstate commerce.  *See*, *e.g., Diversicare of Nicholasville, LLC v. Lowry*, 213 F. Supp. 3d 859, 867-68 (E.D. Ky. 2016) (collecting cases).  This is so because the Arbitration Agreement is patently part of a larger agreement with the nursing home, and "[t]he food, medicine, and durable medical supplies that [the nursing home] provided [to the resident under the larger agreement] must come from somewhere." *Id.* at 868 (quoting *Stacy*, 27 F. Supp. 3d at 792).

Additionally, healthcare provided under such an agreement is an economic activity that implicates interstate commerce.[2] *Id.*

On the other hand, this Court has noted that § 4 plaintiffs' rights may "not be adequately protected based on Kentucky courts' growing hostility toward pre-dispute arbitration agreements in the nursing home setting." *Gilliam*, 205 F. Supp. 3d at 891. This specific point is less concerning in this case for reasons stated below, but for the purposes of the threshold issue of abstention, it makes the sixth factor neutral.

The seventh factor plainly weighs against abstention. As noted above, there is no indication in the record that the State Court Action has progressed past the pleadings stage. Finally, the eighth factor, "the presence or absence of concurrent jurisdiction," "only marginally, if at all, favors abstention" because the FAA "expresses a preference for federal litigation" even if a state court has concurrent jurisdiction. *PaineWebber*, 276 F.3d at 208 (citations omitted).

A majority of the *Colorado River* factors either favor the exercise of jurisdiction or are neutral. And the foregoing demonstrates that there are no "exceptional circumstances necessary to justify abandoning the virtually unflagging obligation of the federal courts to exercise the jurisdiction given them." *Id.* at 209 (cleaned up). Thus, the Court will not abstain from exercising jurisdiction.

### III. Validity and Enforceability of the Arbitration Agreement

---

[2] For these same reasons, Wells' separate argument that the Arbitration Agreement does not involve interstate commerce lacks merit. [Record No. 6-1, pp. 21-22]

Having resolved these threshold issues, the Court now turns to the remaining arguments concerning the validity and enforceability of the Arbitration Agreement. The defendant's motion asserts that these issues merit dismissal for failure to state a claim under Rule 12(b)(6).

But recent precedent from the Sixth Circuit clarifies that this is the wrong approach. Dismissal under Rule 12(b)(6) is not a remedy available to Leonard under the circumstances because the FAA has procedures that supplant those of the Federal Rules of Civil Procedure where they conflict. *Boykin v. Family Dollar Stores of Michigan, LLC*, 3 F.4th 832, 836-38 (6th Cir. 2021); *accord* 9 U.S.C. § 4; Fed. R. Civ. P. 81(a)(6)(B). And, as relevant here, the procedures set forth in § 4 require the Court to consider "only narrow issues: those 'relating to the making and performance of the agreement to arbitrate.'" *Boykin*, 3 F.4th at 837 (quoting *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 404 (1967)). "If, after hearing from the parties, the court is 'satisfied that the making of the agreement' (or its breach) 'is not in issue,' the court 'shall make an order' compelling arbitration." *Id.* (citing 9 U.S.C. § 4). "If instead the court finds that the 'making of the arbitration agreement' (or its breach) is 'in issue,' the court 'shall proceed summarily to the trial' on the disputed question." *Id.* (quoting 9 U.S.C. § 4).

The initial determination regarding whether "the making of the agreement is in issue" generally adheres to a standard akin to that of summary judgment under Rule 56. *See id.* at 838. This is particularly so where the parties rely on evidence outside the face of the complaint, which, of course, is usually not appropriate under Rule 12(b)(6). *See id.* Using the analogous Rule 56 standard, the party seeking to compel arbitration "must initially carry its burden to produce evidence that would allow a reasonable jury to find that a[n] [arbitration] contract exists." *In re StockX Customer Data Sec. Breach Litig.*, 19 F.4th 873, 881 (6th Cir. 2021).

- 15 -

For example, that party may offer "a signed [arbitration] agreement." *Structures USA, LLC v. CHM Indus., Inc.*, No. 3:21-cv-458-BJB-LLK, 2022 WL 882166, at *3 (W.D. Ky. Mar. 24, 2022) (citing *StockX*, 19 F.4th at 881). The party opposing arbitration "must then present specific facts that would allow a reasonable jury to conclude that no [arbitration] contract was formed." *Id.* (citing *Boykin*, 3 F.4th at 839).

The Court acknowledges that the procedural posture of this action is unusual, not least because the parties fail to recognize that the FAA's procedural requirements apply. However, the plaintiff's Complaint includes the petition for FAA relief, which itself functions as a motion because "[a]ny application" for relief under the FAA is "made and heard in the manner provided by law for the making and hearing of motions." 9 U.S.C. § 6. And the petition relies on materials outside its face, including the Arbitration Agreement and Power of Attorney. These materials satisfy the initial burden of producing evidence regarding the formation of the Arbitration Agreement because the plaintiffs claim that the Power of Attorney enabled Leonard to sign that document.

The defendant's arguments styled as Rule 12(b)(6) reasons for dismissal challenge the validity and enforceability of the Arbitration Agreement. And they rely to a considerable extent on documents outside the face of the plaintiffs' pleading, including: (1) the Arbitration Agreement; (2) the Power of Attorney; (3) Opal's Boyd Nursing admission record; (4) several of Opal's medical records; and (5) Leonard's affidavit.

Under the FAA, the question before the Court is whether some material aspect of the Arbitration Agreement is "in issue." If it is not, the Court must compel arbitration. If it is, this matter must proceed to trial consistent with *Boykin*. With these issues in mind, the Court turns to the defendant's remaining "Rule 12(b)(6)" arguments.

### A. Unconscionability

Leonard claims that the Arbitration Agreement is unconscionable.  [Record No. 6-1, pp. 22-23]  In support, the defendant initially contends that:

> The [Arbitration] Agreement is part of a mass-produced, boiler-plate, pre-printed document, likely presented to Opal Wells within a lengthy stack of admissions paperwork.  Positively, the Plaintiffs are aware that the admissions process is often an overwhelming experience.  Yet, the Plaintiffs knowingly present to residents a stack of admissions paperwork consisting of legal documents, which are lengthy and cumbersome, to sign typically at one sitting. This [Arbitration] agreement was further embedded in a lengthy admission agreement rather than being a stand-alone, conspicuous document.

[*Id.*]  The defendant also asserts that "an obviously gross disparity of bargaining power" supports a finding of unconscionability.  [*Id.* at p. 23.]

These arguments are at least partially frivolous.  Leonard knows that *his mother* was not presented with any of the relevant paperwork on September 13, 2019, because *he* signed it on her behalf.  Moreover, as described in further detail below, he claims that his mother was incapacitated at that time such that she could not "communicate her needs to people around her and [was unable] to understand what was being communicated to her."  [Record No. 9, p. 4]  Apparently recognizing the weakness in his argument, Leonard's affidavit includes the following representations:

> I do not recall the representative explaining that I was signing an arbitration agreement or alternative dispute resolution agreement when I was asked to sign new paperwork for their new owners of Boyd Nursing and Rehabilitation Center.
>
> No Boyd Nursing and Rehabilitation Center representative informed me that I had the right to obtain counsel to review any of the documents that I was requested to sign before I signed them.
>
> Based on the Boyd Nursing and Rehabilitation Center representative's explanations, I did not understand that any of the documents that I was signing

- 17 -

would prevent my mother or me from asserting claims of abuse and neglect in a court of law.

If I had known that any document that I was signing would waive my mother's constitutional right to a jury trial for events occurring at Boyd Nursing and Rehabilitation Center, I would not have signed such a document.

[Record No. 9-5, ⁋⁋ 11-14]

But even if one construes the defendant's argument to assert that *Leonard's* agreement with Boyd Nursing was unconscionable, the argument still fails for several reasons.  Under Kentucky law, the doctrine of unconscionability is a "narrow exception" to the "fundamental rule of contract law [holding] that, absent fraud in the inducement, a written agreement duly executed by the party to be held, who had an opportunity to read it, will be enforced according to its terms."  *Conseco Fin. Servicing Corp. v. Wilder*, 47 S.W.3d 335, 341 (Ky. Ct. App. 2001).  "Procedural unconscionability relates to the process by which an agreement is reached and to the form of the agreement."  *Energy Home, Div. of S. Energy Homes, Inc. v. Peay*, 406 S.W.3d 828, 835 (Ky. 2013) (citing *Schnuerle v. Insight Commc'ns Co.*, 376 S.W.3d 561, 576-77 (Ky. 2012)).   "Substantive unconscionability refers to contractual terms that are unreasonably or grossly favorable to one side and to which the disfavored party does not assent."  *Id.* (citing *Schnuerle*, 376 S.W.3d at 577).

The Arbitration Agreement in this case is clearly labeled in capitalized bolded letters: "**16.   ARBITRATION AGREEMENT**."   [Record No. 1-1]    It also holds: "Neither the resident nor his representative is required to sign an agreement for binding arbitration as a condition of admission to, or as a requirement to continue to receive care at the facility."  [*Id.*] Further, the document provides that the "Resident acknowledges that he/she has the right to seek legal counsel before entering into this Agreement."  [*Id.*]

This Court has previously found that nursing home arbitration agreements with similar characteristics fall short of the high bar for procedural unconscionability despite their "boilerplate" language.  *See Gilliam* F. Supp. 3d at 894; *Howell*, 187 F. Supp. 3d at 810.  And the fact that the Arbitration Agreement was part of a larger agreement and paperwork packet does not make it procedurally unconscionable.  *Gilliam*, 205 F. Supp. 3d at 894 (citing *Energy Home*, 406 S.W.3d at 836).

Nor does the unsupported claim of unequal bargaining power.  *See id.*; *Howell*, 187 F. Supp. 3d at 810.  After all, the Arbitration Agreement plainly stated that Leonard did not have to sign it for his mother to continue to receive care from Boyd Nursing.  Had he carefully read the agreement and considered its implications, he could have refused to sign with no negative consequences for Opal.  Similarly, the agreement indicated that he could have consulted legal counsel prior to signing it.  And significantly, the record does not suggest that Boyd Nursing failed to give Leonard an opportunity to read the document and consider the merits of signing it.

Further, Leonard points to no unfair substantive terms of the agreement.  [Record No. 6-1, pp. 22-23]  He does offer a convoluted argument that "Opal Wells was forced to give up her right for resolution of claims . . . potentially includ[ing] full compensatory damages and a complete prohibition on punitive damages" that she could otherwise receive.  [*Id.* at pp. 23-24.]  But setting aside the fact that no one (let alone Opal) was forced to sign the document, Leonard does not identify any provision that operates in this fashion.  Indeed, the Arbitration Agreement actually provides: "The parties agree that damages awarded, if any, in an arbitration proceeding, shall be determined accordance with the provisions of the state or federal law applicable to a comparable civil action, including any prerequisites to, credit against or

limitations on, such damages." [Record No. 1-1]  In other words, the Arbitration Agreement allows damages akin to those the defendant could receive in a standard civil trial.  Needless to say, this is not an unconscionable provision.

And insofar as Leonard's complaint about giving up the constitutional right to a jury trial is an attempt to establish substantive unconscionability, it is nothing more than a general grievance about the nature of arbitration and arbitration agreements.  Such arguments carry no weight.  *See GGNSC Louisville St. Matthews v. Madison*, 254 F. Supp. 3d 901, 912 (W.D. Ky. 2017); *Stacy*, 27 F. Supp. 3d at 788.  Notwithstanding this point, the Arbitration Agreement itself plainly states in its last sentence that its effect "is that all claims between the parties cannot be brought as a lawsuit in a court of law and [that] Resident hereby waives his/her constitutional right to have such claims decided by a judge or jury." [*Id.*]  Again, Leonard could have read the document and understood the effect of signing it.

Ultimately, "an unconscionable contract" is "one which no man in his senses, not under delusion, would make, on the one hand, and which no fair and honest man would accept, on the other." *Conseco*, 47 S.W.3d at 342 (cleaned up).  The defendant has not offered evidence to suggest that the Arbitration Agreement meets this standard.[3]

### B. Leonard's Authority to Sign the Arbitration Agreement

Leonard's last argument regarding the viability of the Arbitration Agreement concerns his authority to sign the Arbitration Agreement.  Leonard claims that the authority he

---

[3] The defendant also claims that the Arbitration Agreement is "void as against public policy." [Record No. 6-1, p. 20]  This argument appears to be coextensive with the unconscionability arguments and will be rejected for the same reasons. [*See id.* at pp. 23-24.]

maintained as Opal's Power of Attorney expired when she became incapacitated, rendering him incapable of signing the Arbitration Agreement on her behalf.  [Record No. 6-1, pp. 20-21]

The Power of Attorney itself states:

> This unlimited power of attorney may give the person whom you designate (your "attorney-in-fact") broad powers to handle your finances and property, which includes powers to encumber, sell or otherwise dispose of any real or personal property without advance notice to you or approval by you.  THE POWERS WILL NOT EXIST AFTER YOU BECOME DISABLED, OR INCAPACITATED.

[Record No. 1-3]  The document goes on to appoint Leonard as Opal's attorney-in-fact and specifically grant him:

> The maximum power under law to perform any act on behalf of myself that I could do personally, including but not limited to, all acts relating to any and all of my financial transactions and/or business affairs including all banking and financial transactions, all real estate or personal property transactions, all insurance or annuity transactions, all claims and litigation, and any and all business transactions.

[*Id.*]

Leonard points to several pieces of evidence in support of the assertion that his mother was incapacitated prior to the signing of the Arbitration Agreement.  First, he cites Opal's Boyd Nursing admission record dated October 31, 2020.[4]  [Record No. 9-2]  The admission record documents, *inter alia*, the following prior diagnoses and corresponding onset dates: (1) Parkinson's disease (November 26, 2013); (2) unspecified dementia without behavioral disturbance (October 6, 2015); and (3) cognitive communication deficit (January 1, 2017).  [*Id.*]

---

[4]  Although it is labeled an "admission record," the record documents Opal's discharge on September 8, 2020, after her death.

Second, he cites medical records from May 2016 appointments relating to an outpatient surgical procedure to treat a facial basil cell carcinoma.  [Record Nos. 9-3 and 9-4]  He does not assert that the carcinoma itself rendered Opal incapacitated, but rather observes that the notes from these appointments state, "The patient is an extremely debilitated 85-year-old," and "The pt. is unable to verbalize understanding."  [Record Nos. 9-3 and 9-4]  Finally, Leonard's affidavit contains the following assertions relevant to this issue:

> When Opal Wells went into the nursing home in 2013, she was physically helpless and she was mostly incapable of managing her affairs.
>
> By 2014, Opal Wells' mental state had deteriorated to the point where she did not recognize her grandsons.
>
> By 2015, when her husband died, Opal Wells did not understand what was told to her and could not attend funeral due to her lack of mental capacity.
>
> When the new owners took over Boyd Nursing and Rehabilitation, they undertook steps to obtain signatures on paperwork regarding Opal Wells.
>
> When the paperwork was signed on September 13, 2019, Opal Wells had been diagnosed with dementia and Parkinson's for years.
>
> When the paperwork was signed on September 13, 2019, Opal Wells was nonverbal, could not communicate her wants, needs, or wishes in any way.
>
> When the paperwork was signed on September 13, 2019, Opal Wells was unable to indicate if she understood what was being told to her or requested of her.

[Record No. 9-5, ¶¶ 3-9]

At the outset, the Court notes that, under Kentucky law, "construction of a power of attorney is a question of law for the court."  *Ping v. Beverly Enter., Inc.*, 376 S.W.3d 581, 589 (Ky. 2012).  As it pertains to the present analysis, the Power of Attorney's construction hinges on the fact that it is not durable.

Kentucky's version of the Uniform Power of Attorney Act ("UPOAA") was enacted in 2020 and "applies to a power of attorney created before, on, or after July 15, 2020."  KRS § 457.460(1).  Under the UPOAA, a "'[p]ower of attorney' means a writing or other record that grants authority to an agent to act in the place of the principal, whether or not the term power of attorney is used." KRS § 457.020(7).  A "durable" power of attorney is "not terminated by the principal's incapacity," and a power of attorney is considered durable "unless it expressly provides that it is terminated by the incapacity of the principal."  KRS §§ 457.020(2), 457.040.

As relevant here, "incapacity" is defined as the "inability of an individual to manage property or business affairs because the individual . . . [h]as an impairment in the ability to receive and evaluate information or make or communicate decisions even with the use of technological assistance . . . ."  KRS § 457.020(5)(a).  As one might expect, the UPOAA also provides that a power of attorney "terminates when . . . [t]he principal becomes incapacitated, if the power of attorney is not durable."  KRS § 457.100(1)(b).  And the authority of an agent acting pursuant to a power of attorney generally "terminates when . . . [t]he power of attorney terminates."  KRS § 457.100(2)(d).

The Power of Attorney at issue in this case was not durable because it clearly specified that the powers it conferred upon Leonard would terminate after Opal became incapacitated.

- 23 -

Whether her impairments rendered her incapacitated for the purposes of the statute is a question of fact that does not involve construction of the Power of Attorney.[5]

Leonard has offered evidence of diagnoses prior to September 13, 2019, that may qualify as impairments that rendered her incapacitated by affecting her ability to receive and evaluate information or make or communicate decisions. The relevant portions of his affidavit support this argument, and the medical records he has produced may also support this claim to the extent they suggest that Opal was "unable to verbalize understanding" based on such impairments.

The plaintiffs do not provide any reason to reject Leonard's argument at this stage of the proceeding. Their FAA petition is premised entirely on the theory that the Power of Attorney enabled Leonard to sign the Arbitration Agreement on Opal's behalf, and they do not contend that he possessed such authority for any other reason. And while they "dispute [Leonard's] interpretation of the power of attorney in question," they do not offer a contrary interpretation. [Record No. 7, p. 10]

---

[5] Even if the UPOAA is not retroactive such that it applies to the Power of Attorney in this case, the law prior to its effective date supports the same conclusion. Under the old statutory scheme, a power of attorney was *not* durable unless it included language similar to, "'This power of attorney shall not be affected by subsequent disability or incapacity of the principal, or lapse of time', or 'This power of attorney shall become effective upon the disability or incapacity of the principal.'" *Ping*, 376 S.W.3d at 591 (quoting KRS 386.093(1) (2000)). Opal's Power of Attorney contained contrary language and would accordingly not be considered durable. Moreover, an agent's authority under non-durable powers of attorney generally terminated upon the principal's incapacitation under the old statutory scheme. *See*, *e.g.*, *Kindred Nursing Ctrs. L.P. v. Leffew*, 398 S.W.3d 463, 470 (Ky. 2013) (citing KRS § 386.093(4)). And courts gauged incapacitation by assessing whether impairments affected principals' communicative abilities. *See New Meadowview Health and Rehab. Ctr., LLC v. Booker*, 550 S.W.3d 56, 59 (Ky. Ct. App. 2018). Thus, the pertinent question is the same under the old and new statutes.

The plaintiffs also appear to advance an argument regarding Opal's contractual capacity at the time the Arbitration Agreement was signed. [Record No. 7, p. 10] However, Opal's contractual capacity is irrelevant because she did not actually sign the agreement in September 2019. Instead, the question is whether she lacked capacity for the purposes of the relevant statutory scheme such that the Power of Attorney terminated before Leonard signed the Arbitration Agreement.

Two further points on this issue warrant brief discussion. First, the current statutory scheme includes the following exception to the general rule that an agent's authority to bind the principal (and her successors in interest) ends upon termination of a power of attorney:

> Termination of an agent's authority or of a power of attorney is not effective as to the agent or another person that, without actual knowledge of the termination, acts in good faith under the power of attorney. An act so performed, unless otherwise invalid or unenforceable, binds the principal and the principal's successors in interest.

KRS § 457.100(4). However, this provision would appear inapplicable because it pertains to "acts" and "act[s] done before July 15, 2020, [are] not affected by" the UPOAA. KRS § 457.460(4). This contrasts with the same section's provision that retroactively applies the UPOAA to powers of attorney *themselves*. KRS § 457.460(1). And the law prior to the UPOAA's effective date did not recognize such an exception. *See* KRS § 386.093 (2000). Thus, whether Leonard lacked actual knowledge of the Power of Attorney's potential termination such that he could bind Opal (and Opal's estate) when he signed the Arbitration Agreement does not affect the present analysis.

Second, the UPOAA contains another exception to the general rule regarding the termination of an agent's authority to bind a principal or her successors in interest after the termination of a non-durable power of attorney:

- 25 -

> Incapacity of the principal of a power of attorney that is not durable does not revoke or terminate the power of attorney as to an agent or other person that, without actual knowledge of the incapacity, acts in good faith under the power of attorney. An act so performed, unless otherwise invalid or unenforceable, binds the principal and the principal's successors in interest.

KRS § 457.100(5). Again, this specific provision would not appear to apply because it pertains to whether the agent's "acts" are valid. But unlike the first exception, this provision had a counterpart under the previous power of attorney statutes. *See Leffew*, 398 S.W.3d at 470 (citing KRS § 386.093(4) (2000)). Thus, the Court will not preclude the plaintiffs from asserting that Leonard lacked actual knowledge of Opal's alleged incapacity on September 13, 2019, such that he could in good faith bind Opal and her successors by signing the Arbitration Agreement.[6]

In light of the foregoing, the Court concludes that the "the making of the agreement is in issue" such that this matter must proceed to trial on the following limited issues: (1) whether Opal was incapacitated prior to the signing of the Arbitration Agreement; and, if necessary (2) whether Leonard lacked actual knowledge of Opal's incapacitation such that he could in good faith validly bind her and her successors in interest. Notably, Leonard indicates that he does not possess most of his mother's medical records from Boyd Nursing. [Record No. 9, p. 3] The Sixth Circuit has stated that "parties may seek targeted discovery on . . . disputed contract-formation questions" under the FAA, provided that "any discovery must comport with § 4, which 'calls for a *summary trial*—not death by discovery.'" *Boykin*, 3 F.4th at 844 (emphasis in original) (quoting *Howard v. Ferrellgas Partners, L.P.*, 748 F.3d 975, 978 (10th

---

[6] That said, it may be the case that this point is not in dispute. Assuming, *arguendo*, that Opal was incapacitated, the evidence before the Court suggests that Leonard likely had actual knowledge of her incapacitation.

Cir. 2014)).  Thus, the Court will permit the parties to conduct limited discovery pertaining to the triable issues if necessary.

## IV.  Wrongful Death Claim

Finally, Leonard states that the Court should "be aware" that even if the Arbitration Agreement is valid and enforceable, it "would be ineffective to bind the wrongful death beneficiaries and this claim would necessarily have to proceed in the trial court." [Record No. 6-1]  This issue pertains not only to the arbitrability of the wrongful death claim, but also the question of whether the Court should enjoin the entirety of the State Court Action if it compels arbitration.

Leonard seemingly ignores the first sentence of the Arbitration Agreement, which suggests that the scope of the document is an issue for the arbitrator by providing that "any legal dispute, controversy, demand or claim . . . arising out of, or relating to Resident's admission to facility, or any service, diagnosis, or care of the Resident provided by facility *including the applicability of this Arbitration Agreement . . .* shall be resolved exclusively by binding arbitration."  [Record No. 1-1 (emphasis added).]  Notwithstanding this point, the defendant's final argument assumes that the making of the agreement is not in issue.  The Court has determined that it is in issue due to the dispute over Opal's capacity and Leonard's corresponding authority.  Thus, a ruling regarding the wrongful death claim and the breadth of a potential injunction is premature.

## V.  Conclusion

Based on the foregoing analysis and discussion, it is hereby

**ORDERED** as follows:

- 27 -

1.      Defendant Leonard Wells' motion to dismiss [Record No. 6] is **DENIED** to the extent it requests dismissal of this action.

2.      This matter will proceed to trial on the limited issues described above.  The parties are **DIRECTED** to tender on or before September 9, 2022, a joint proposed plan for the efficient disposition of this action.  This filing should include the parties' views on: (1) whether limited discovery is necessary; (2) the length of any limited discovery period; (3) whether this matter should be tried as a bench or jury trial; (4) potential agreed trial dates; (5) the estimated length of trial; and (6) any other scheduling issues the parties deem pertinent, bearing in mind the procedural requirements of the FAA and (where applicable) the Federal Rules of Civil Procedure.

       Dated:  August 30, 2022.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky